**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| _____ §<br>**UNITED STATES OF AMERICA and** §<br>**STATE OF TEXAS,** §<br> §<br>                    **Plaintiffs,** §<br> §<br>        **v.** §<br> §<br>**E. I. DU PONT DE NEMOURS AND** §<br>**COMPANY,** §<br> §<br>                    **Defendant.** §<br>_____§ | **Civil Action No. _____** |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Texas, by the authority of the Attorney General of Texas and through the undersigned attorneys, acting at the request of the Texas Commission on Environmental Quality ("TCEQ"), file this complaint and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought against E. I. du Pont de Nemours and Company ("DuPont" or "Defendant") pursuant to Section 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a) and (g); the Texas Solid Waste Disposal Act (Tex. Health & Safety Code ch. 361); Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b); the Texas Clean Air Act (Tex. Health & Safety Code ch. 382); Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 7.002 of the Texas Water Code, Tex.

Water Code § 7.002, for injunctive relief and the assessment of civil penalties. The violations that are the subject of this complaint have occurred at Defendant's La Porte facility located at 12501 Strang Road, La Porte, Harris County, Texas (the "Facility").

2.      The violations that are the subject of this Complaint relate to Defendant's failure to comply with RCRA and the Texas Solid Waste Disposal Act, and regulations promulgated thereunder, with respect to the generation, treatment, storage, and disposal of hazardous waste at the Facility; Defendant's failure to comply with regulatory requirements in violation of the CAA and the Texas Clean Air Act, and regulations promulgated thereunder; and Defendant's failure to comply with regulatory requirements in violation of the CWA and regulations promulgated thereunder.

3.      As a result of Defendant's failure to comply with federal and state laws and regulations, excess hazardous air pollutants and hazardous wastes have been and are being emitted, discharged or released into the environment from Defendant's Facility.  These hazardous air pollutants and hazardous wastes, and some of their harmful effects, include: carbamate, which is toxic to fish, aquatic invertebrates, and mammals and highly toxic to insects; methylene chloride, which is a carcinogen; methomyl, which is highly toxic to fish, birds, and mammals; methyl isocyanate, which is toxic to wildlife; and volatile organic compounds ("VOCs"), which contribute to the formation of ground-level ozone, a major constituent of smog.

## **JURISDICTION**

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n).  This Court has supplemental jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1367.

5.     This Court has personal jurisdiction over the Defendant because Defendant's Facility is located in Harris County, Texas, meaning it is presently within the jurisdictional boundaries of the United States District Court for the Southern District of Texas, as established by Congress under 28 U.S.C. § 124(b).

## VENUE

6.     Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b)-(c) and 1395(a); Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), because the violations alleged in the Complaint are alleged to have occurred in, and Defendant conducts business in, this Judicial District.

## NOTICE

7.     Notice was given to the State of Texas ("State") prior to the commencement of this action as required by Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2) and Section 113(b) of the CAA, 42 U.S.C. § 7413(b). Texas is a co-plaintiff in this action.

## PARTIES

8.     At all times relevant to this action, DuPont is and has been a corporation organized under the laws of the State of Delaware and doing business in Texas.

9.     At all times relevant to this action, DuPont is and has been a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15); Section 302(e) of the CAA, 42 U.S.C. § 7602(e); Section 502(5) of the CWA, 33 U.S.C. § 1362(5); and Tex. Health & Safety Code §§ 361.003(23) & 382.003(10).

10.     The United States, on behalf of the EPA, is a Plaintiff in this action.

3

11.     The State of Texas, on behalf of the TCEQ, is a Plaintiff in this action.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  RCRA

12.     RCRA, 42 U.S.C. § 6901 *et seq.*, was enacted on October 21, 1976, and establishes a comprehensive program to be administered by the Administrator of EPA ("Administrator"), regulating the generation, transportation, treatment, storage, and disposal of hazardous waste.

13.     Pursuant to its authority under RCRA, EPA promulgated regulations at 40 C.F.R. Parts 260 through 272 that are applicable to generators, transporters, and treatment, storage, and disposal facilities. These regulations provide detailed requirements governing the activities of persons who generate hazardous waste. These regulations generally prohibit the treatment, storage, and disposal of hazardous waste without a permit or equivalent "interim status." These regulations also prohibit land disposal of certain hazardous waste.

14.     Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, and 40 C.F.R. Part 271, the Administrator may authorize a state to administer a RCRA hazardous waste program in lieu of the federal program when he or she deems the state program to be substantially equivalent to the federal program. When a state obtains such authorization, federally-approved state regulations apply in lieu of the federal RCRA regulations in that state. Federally-approved state RCRA regulations are enforceable by the United States pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

15.     The Administrator granted final authorization to Texas to administer its Hazardous Waste Management Program in lieu of the federal program on December 12, 1984, effective December 26, 1984. 49 Fed. Reg. 48,300; *see also* 40 C.F.R. § 272.2201. There have

4

been subsequent authorized revisions to the base program.

16.     In Texas, the authorized hazardous waste program is managed by the TCEQ, pursuant to the Texas Solid Waste Disposal Act, Tex. Health & Safety Code ch. 361, and the rules and regulations promulgated thereunder at 30 Texas Administrative Code (Tex. Admin. Code) Chapter 335. For ease of reference, the Texas regulations are cited below followed by the applicable federal hazardous waste regulation.

17.     Pursuant to 30 Tex. Admin. Code § 335.1(146)(A) [40 C.F.R. § 261.2(a)(1)], "solid waste" is defined as any discarded material, "including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations, and from community and institutional activities," subject to certain exceptions not applicable here. Pursuant to 30 Tex. Admin. Code § 335.1(146)(B) [40 C.F.R. § 261.2(a)(2)], a discarded material is any material which is abandoned, recycled, considered inherently waste-like, or a military munition. Pursuant to 30 Tex. Admin. Code § 335.1(146)(C) [40 C.F.R. § 261.2(b)], materials are solid wastes if they are abandoned by being (1) disposed of, (2) burned or incinerated, (3) accumulated, stored, or processed (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated, or (4) sham recycled.

18.     Pursuant to 30 Tex. Admin. Code § 335.1(73) [40 C.F.R. § 261.3], a solid waste, as defined in 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2], is "hazardous waste" if it is "identified or listed as a hazardous waste by the administrator of the United States Environmental Protection Agency in accordance with the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 United States Code, §§6901 *et seq.*"

19.     Pursuant to 40 C.F.R. § 261.3, a solid waste is a hazardous waste if it meets any of the following criteria listed in 40 C.F.R. § 261.3(a)(2)(i)-(iv): generally, if it exhibits any of

5

the characteristics of hazardous waste (ignitability, corrosivity, reactivity, or toxicity); if it is

listed; or if it is a mixture of a solid waste and one or more hazardous waste(s) and has not been

excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b).

20.     Pursuant to 40 C.F.R. § 261.3(a)(2)(iv) and (b)(2), if a listed hazardous waste

(other than a waste listed solely because it exhibits the characteristic of ignitability, corrosivity,

and/or reactivity) is mixed with a solid waste, the resulting mixture is a listed hazardous waste.

21.     Pursuant to 40 C.F.R. § 261.32, "K156" waste, which is defined as "[o]rganic

waste (including heavy ends, still bottoms, light ends, spent solvents, filtrates, and decantates)

from the production of carbamates and carbamoyl oximes" is a hazardous waste.

22.     Pursuant to 40 C.F.R. § 261.32, "K157" waste, which is defined as "[w]astewater

(including scrubber waters, condenser waters, washwaters, and separation waters) from the

production of carbamates and carbamoyl oximes," is a hazardous waste.

23.     Pursuant to 40 C.F.R. § 261.31, "F002" waste, which includes the spent

halogenated solvent methylene chloride, is a hazardous waste.

24.     Pursuant to 40 C.F.R. § 261.31, "F003" waste, which includes the spent non-

halogenated solvent methanol, is a hazardous waste.

25.     Pursuant to 40 C.F.R. § 261.21, a solid waste exhibits the hazardous characteristic

of ignitability if it is a liquid (other than an aqueous solution containing less than 24 percent

alcohol by volume) and has a flash point less than 60º C (140º F).

26.     Pursuant to 30 Tex. Admin. Code § 335.1(67) [40 C.F.R. § 260.10], a "generator"

is defined as "[a]ny person, by site, who produces municipal hazardous waste or industrial solid

waste; any person who possesses municipal hazardous waste or industrial solid waste to be

shipped to any other person; or any person whose act first causes the solid waste to become

subject to regulation" under 30 Tex. Admin Code ch. 335 ("Industrial Solid Waste and Municipal Hazardous Waste"), subject to certain exceptions not relevant here.

27.     Pursuant to 30 Tex. Admin. Code § 335.61 [40 C.F.R. § 262.10(g)], a generator of hazardous waste must follow the requirements prescribed in Subchapter C, Chapter 335, Part 1, Title 30, of the Texas Administrative Code [40 C.F.R. Part 262].

28.     Pursuant to Sections 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1], hazardous waste shall not be stored, processed (treated), or disposed of without a permit.

29.     The regulations at 40 C.F.R. Part 264 (Standards for Owners and Operators of Hazardous Waste Treatment, Storage and Disposal Facilities) apply to facilities that seek and obtain an operating permit for treatment, storage or disposal of hazardous waste. The regulations at 40 C.F.R. Part 265 (Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage and Disposal Facilities) apply to facilities that are in operation at the time the permit requirement is triggered (e.g., when the program was first put in place or when new units or wastes become regulated through newly promulgated regulations) and initiate the permit application process. 40 C.F.R. Part 265 establishes the operating requirements that apply during the period of time between the permit application and permit issuance which, especially when the permit program was first established, could be a significant period of time given the back-log of applicants and the complexity of the permit process. The regulatory classification for facilities governed by Part 265 is known as "interim status." The Part 265 regulations also apply to those facilities that were eligible for interim status but failed to take the steps necessary to obtain it. In most respects, the regulations in Parts 264 and 265 are similar, if not identical.

30.     Pursuant to Sections 3008(a) and (g) and 3006(g) of RCRA, 42 U.S.C. §§ 6928(a)

7

and (g) and 6926(g), the United States may enforce the federally-approved Texas hazardous waste program, as well as the federal regulations that remain effective in Texas, by filing a civil action in United States District Court seeking civil penalties, and/or injunctive relief.

31.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 584, 599-60, and as provided in 40 C.F.R. Part 19, Defendant is liable for a civil penalty of up to $32,500 per day for each violation occurring after March 15, 2004 through January 12, 2009, up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, and up to $75,867 per day for each violation occurring after November 2, 2015, and assessed on or after January 13, 2020.

32.     Pursuant to Tex. Water Code § 7.105, upon the request of the TCEQ, "the attorney general [of Texas] shall institute a suit in the name of the state for injunctive relief…, to recover a civil penalty, or for both injunctive relief and a civil penalty." This requirement applies generally to any violation of a "commission rule or a provision of a permit issued by the commission," Tex. Water Code § 7.032; or "a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute." Tex. Water Code § 7.101. With respect to violations of the Texas Solid Waste Disposal Act and the regulations promulgated thereunder, Defendant is liable for a civil penalty of "not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper. Each day of a continuing violation is a separate violation." Tex. Water Code § 7.102.

**B. <u>Clean Air Act</u>**

33.     Title I of the CAA establishes a technology-based control program (i.e., based on Maximum Achievable Control Technology, or "MACT") to reduce stationary source emissions of hazardous air pollutants ("HAPs"). *See* CAA Section 112(d), 42 U.S.C. § 7412(d).

34.     Section 112 of the CAA, 42 U.S.C. § 7412, directs EPA to promulgate standards to reduce emissions of listed HAPs. These standards are collectively referred to as the National Emission Standards for Hazardous Air Pollutants or "NESHAP."

35.     The level of control mandated by the CAA for the NESHAP is MACT or:

> … the maximum degree of reduction in emissions of the [HAP] … that the Administrator, taking into consideration the cost of achieving such emission reduction, and any nonair quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies….

*See* CAA Section 112(d)(2), 42 U.S.C. § 7412(d)(2). The MACT standards can include the application of measures, processes, methods, systems or techniques including process changes, control equipment, design, work practice or operational changes, or a combination of all of the above.

36.     Federal NESHAP provisions for general and specific source categories are found in 40 C.F.R. Part 63.

37.     Section 112(l) of the CAA enables EPA to approve a state program for implementation and enforcement of the NESHAP program. 42 U.S.C. § 7412(l). As part of its CAA Title V submission, TCEQ stated that it intended to use the mechanism of incorporation by reference to adopt Section 112 of the CAA into its regulations. 60 Fed. Reg. 30,444 (June 7, 1995); 61 Fed. Reg. 32,699 (June 25, 1996). On December 6, 2001, EPA promulgated final full approval of Texas' operating permits program effective November 30, 2001. 66 Fed. Reg.

63,318. Texas has incorporated by reference 40 C.F.R. Part 63 in 30 Tex. Admin. Code ch. 113,

subch. C. EPA retains concurrent authority to enforce any applicable emission standard or

requirement under CAA Section 112. 42 U.S.C. § 7412(l)(7).

**Pesticide Active Ingredient Production MACT**

38.     In 1999, EPA promulgated the final National Emissions Standards for Organic

Hazardous Air Pollutants for Pesticide Active Ingredient Production ("PAI MACT"), codified at

40 C.F.R. Part 63, Subpart MMM.  64 Fed. Reg. 33,589 (June 23, 1999). TCEQ incorporates by

reference the PAI MACT standards at 30 Tex. Admin. Code § 113.700.  The PAI MACT

standards are designed to reduce HAP emissions from existing and new facilities that

manufacture pesticide active ingredients ("PAI") that are used in insecticides, herbicides, and

fungicides. Pursuant to 40 C.F.R. § 63.1361, a PAI is any material that: (1) is an active

ingredient within the meaning of Section 2(a) of the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA"), 7 U.S.C. § 136(a); (2) is used to produce an insecticide, herbicide,

or fungicide end use pesticide product; (3) consists of one or more organic compounds; and (4)

must be labeled in accordance with 40 C.F.R. Part 156 for transfer, sale, or distribution (as

required under FIFRA). Sources regulated by the PAI MACT are those with the potential to emit

over 10 tons per year ("tpy") of any particular HAP or 25 tpy of any combination of HAPs. 40

C.F.R. §§ 63.1360 and 63.2. Covered PAI process units include the processing equipment, waste

management units, heat exchange systems, cooling towers, associated storage vessels, and

connected piping and related components that are assembled to manufacture an intended product.

40 C.F.R. §§ 63.1360(a), (f) and 63.1361.

39.     The PAI MACT defines "process" as "a logical grouping of processing equipment

which collectively function to produce a product. . . [including] all, or a combination of, reaction,

10

recovery, separation, purification, treatment, cleaning, and other activities or unit operations which are used to produce a PAI or integral intermediate." 40 C.F.R. § 63.1361.

40.     The PAI MACT defines a "process vent" as "a point of emission from processing equipment to the atmosphere or a control device. The vent may be the release point for an individual unit operation, or it may be the release point for emission streams from multiple unit operations that have been manifolded together into a common header. Examples of a process vent include … vents on condensers used for product recovery…." 40 C.F.R. § 63.1361.

41.     The PAI MACT requires that existing sources subject to the PAI MACT control HAP emissions from their process vents by complying with the provisions at 40 C.F.R. § 63.1362(b).

42.     Section 63.1362(b) of the PAI MACT requires organic HAPs from an existing affected source to choose one of two compliance options: (a) the uncontrolled organic HAP emission rate shall not exceed 0.15 Megagrams per year ("Mg/yr") from the sum of all process vents within a process (40 C.F.R. § 63.1362(b)(2)(i)); or (b) organic HAP emissions from process vents must meet applicable emissions standards as set forth in 40 C.F.R. § 63.1362(b)(2)(ii) through (iv). These emissions standards include percent-by-weight emissions reductions and the option of sending process vents to a flare that meets the requirements of 40 C.F.R. § 63.11(b). 40 C.F.R. § 63.1362(b)(2)(ii).

43.     For percent-by-weight reductions of uncontrolled HAP emissions, the PAI MACT requires that uncontrolled organic HAP emissions from a process vent be reduced by 98% by weight or greater if the flow-weighted average flow-rate for the vent as calculated in Equation 1 of 40 C.F.R. § 63.1362(b)(2)(ii)(A) is less than or equal to that calculated in Equation 2 of that provision, unless it can be demonstrated that the control device cannot meet a 98% destruction

11

efficiency. 40 C.F.R. § 63.1362(b)(2).

44.     The PAI MACT also establishes standards for emissions of hydrochloric acid ("HCl") and chlorine ("$Cl_2$") from existing source process vents. For each HCl or $Cl_2$ process, the owner or operator must choose to comply with one or the other of two options: (A) The sum of all HCl and $Cl_2$ emissions from all process vents and HCl emissions from the combustion of halogenated process vent emissions from all sources within a process shall not exceed 6.8 Mg/yr; or (B) uncontrolled HCl and $Cl_2$ emissions, including the HCl emissions from the combustion of halogenated process vent emissions, from the sum of all process vents within a process must be reduced by at least 94% or to outlet concentrations of no more than 20 parts per million by volume ("ppmv"). 40 C.F.R. § 63.1362(b)(3).

45.     The PAI MACT, at 40 C.F.R. § 63.1362(d), requires owners or operators of an affected source to meet wastewater requirements set forth in 40 C.F.R. §§ 63.132-63.147, except as differentiated by 40 C.F.R. § 63.1362(d). As set forth in 40 C.F.R. § 63.132(a)(1), a facility is required to determine which wastewater streams need to be controlled for compounds set forth in Table 9 of the provision. 40 C.F.R. Part 63, Table 9. As part of that determination, a facility must determine whether a wastewater stream is a "Group 1" or "Group 2" wastewater stream following the procedures set forth in 40 C.F.R. § 63.132(c) and (e).

46.     When an owner or operator uses a series of treatment processes to comply with emissions limitations for a Group 1 wastewater stream, the owner or operator must comply with the performance standards for treatment processes set forth at 40 C.F.R. § 63.138(a)(7). Those requirements include the following: each treatment process must meet the applicable requirements of §§ 63.133 – 63.137; the owner or operator must identify and keep records of the combination of treatment processes in a document called a Notification of Compliance Status

12

("NOCS"); and the owner or operator must conduct a performance test or design evaluation to determine compliance across the entire process. 40 C.F.R. § 63.138(a)(7)(i)(A)-(D). "If a performance test is conducted, the 'inlet' shall be the point at which the wastewater stream or residual enters the first treatment process, or the vented gas stream enters the first control device. The 'outlet' shall be the point at which the treated wastewater stream exits the last treatment process, or the vented gas stream exits the last control device." 40 C.F.R. § 63.138(a)(7)(i)(D).

47.     An owner or operator of a Group 1 wastewater stream or residual may send the stream off-site for treatment if it complies with the requirements of 40 C.F.R. § 63.132(g)(1). These requirements include restrictions on shipping a wastewater stream or residual off-site unless the transferee has submitted to EPA a written certification that the transferee will manage and treat any Group 1 wastewater stream or residual removed from a Group 1 wastewater stream received from a source subject to the requirements of the PAI MACT.  40 C.F.R. § 63.132(g).

48.     Because the PAI MACT allows a facility several options for compliance with the various emissions standards, sources subject to the PAI MACT must submit a NOCS to inform the relevant authorities of how a facility has chosen to comply with the PAI MACT. 40 C.F.R. §§ 63.1368(a), (f) and 63.9(h). The NOCS must include: the methods used to determine compliance; the results of any performance tests; the methods that will be used for determining continuing compliance; the type and quantity of HAPs emitted by the source; a description of the air pollution control equipment (or method) for each emission point (including each control device/method) for each HAP, as well as the control efficiency; and a statement by the owner or operator "as to whether the source has complied with the relevant standard or other requirements." 40 C.F.R. § 63.9(h)(2)(i)(A)-(G). Additionally, the NOCS must include "the results of any applicability determinations, emissions calculations, or analyses used to identify

and quantify HAP emissions from the affected source," as well as the information used to demonstrate compliance, such as emissions profiles, performance tests, engineering analysis, design evaluations, or calculations. 40 C.F.R. § 63.1368(f)(1)-(2).

**Polyether Polyols Production MACT**

49.     In 1999, EPA finalized MACT standards for the polyether polyols production ("PPP") source category. 64 Fed. Reg. 29,420 (June 1, 1999). Generally, polyether polyols are used in making lubricants, adhesives, sealants, cosmetics, soaps, and feedstock polymers for urethanes production. The final standards, set forth in 40 C.F.R. Part 63, Subpart PPP, regulate HAP emissions from process units and emissions points at a PPP production site, and include emissions standards for storage vessels, process vents, wastewater, and heat exchangers. TCEQ incorporates by reference the PPP MACT standards at 30 Tex. Admin. Code § 113.730. The PPP MACT requirements also contain procedures and methods for determining how the regulations apply to the facility, along with recordkeeping and reporting requirements; startup, shutdown, and malfunction requirements; and other procedural rules common to all source categories regulated under the generic MACT standards.

**Hazardous Organic NESHAP**

50.     On April 22, 1994, EPA issued the Hazardous Organic NESHAP (commonly referred to as the "HON") to regulate the emissions of certain organic hazardous air pollutants from synthetic organic chemical manufacturing industry ("SOCMI") production. The HON was issued as subparts F, G, H, and I in 40 C.F.R. Part 63.  *See* 59 Fed. Reg. 19,402. TCEQ incorporates by reference the HON at 30 Tex. Admin. Code §§ 113.110, 113.120, 113.130 and 113.140.

51.     The HON applies to SOCMI process units that: (1) are part of a major source as

14

defined in Section 112(a) of the CAA, 42 U.S.C § 7412(a); (2) produce as a primary product a SOCMI chemical listed in 40 C.F.R. § 63, Subpart F, Table 1; and (3) use as a reactant or manufacture as a product, by-product, or co-product one or more of the organic HAPs listed in 40 C.F.R. § 63, Subpart F, Table 2. 40 C.F.R. § 63.100(b). For the SOCMI source category under the HON, a source comprises all SOCMI chemical manufacturing process units that are subject to the HON and are located at contiguous or adjoining properties under common control. 40 C.F.R. § 63.101(b) (see the definitions of "Source" and "Plant Site"). Regulated emission points under the HON include, among other things, process vents. 40 C.F.R.§ 63.100(e).

52.     Under the HON, there are two separately defined types of process vents. A "Group 1" process vent is a process vent with a flow rate greater than or equal to 0.005 standard cubic meters per minute, an organic HAP concentration greater than or equal to 50 parts per million by volume (ppmv), and a Total Resource Effectiveness ("TRE") index value less than or equal to 1.0. 40 C.F.R. § 63.111(b). "Group 2" process vents are vents that are not Group 1 process vents. *Id.* Facilities have the option of leaving process vents "ungrouped" so long as such ungrouped vents comply with the HON's process vent control requirements set forth at Section 63.113(a). *See* 40 C.F.R. § 63.113(h).

53.     Gas from Group 1 or ungrouped process vents must either: (1) be reduced by 98% or be controlled to 20 ppmv, whichever is less stringent; (2) be controlled by a flare; or (3) achieve and maintain a TRE index value greater than 1.0. 40 C.F.R. § 63.113(a).

54.     Whenever any person has violated, or is in violation of, any requirement or prohibition of CAA Section 112(b), the Administrator is authorized under CAA Section 113(b), 42 U.S.C. § 7413(b), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701

note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub.

L. No. 114-74 § 701, 129 Stat. 584, 599-60, and as provided in 40 C.F.R. Part 19, to initiate a

judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of

up to $32,500 per day for each such violation occurring after March 15, 2004 through January

12, 2009, up to $37,500 per day for each violation occurring after January 12, 2009 through

November 2, 2015, and up to $101,439 per day for each violation occurring after November 2,

2015, and assessed on or after January 13, 2020.

55.     Whenever any person has violated the Texas Clean Air Act (Tex. Health & Safety

Code ch. 382) or the regulations promulgated thereunder, that person is liable for a civil penalty

of "not less than $50 nor greater than $25,000 for each day of each violation as the court or jury

considers proper. Each day of a continuing violation is a separate violation." Tex. Water

Code § 7.102.

**C.  Clean Water Act**

**Spill Prevention, Control, and Countermeasure Plan**

56.     Pursuant to Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), the

President shall issue regulations "establishing procedures, methods, and equipment and other

requirements for equipment to prevent discharges of oil … from onshore … facilities, and to

contain such discharges…."

57.     Initially by Executive Order 11,548, 35 Fed. Reg. 11,677 (July 22, 1970), and

most recently by Section 2(b)(1) of Executive Order 12,777, 56 Fed. Reg. 54,757 (Oct. 22,

1991), the President delegated to EPA the authority under Section 311(j)(1)(C) of the CWA, 33

U.S.C. § 1321(j)(1)(C), to issue the regulations referenced in the preceding Paragraph for non-

transportation-related onshore facilities.

58.     Pursuant to Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), EPA promulgated Spill Prevention, Control, and Countermeasure Plan ("SPCC Plan") regulations, codified at 40 C.F.R. Part 112, which establish requirements for procedures, methods, and equipment to prevent discharges of oil and hazardous substances from vessels and from onshore facilities into or upon the navigable waters of the United States or adjoining shorelines.

59.     The SPCC Plan regulations in 40 C.F.R. Part 112 are applicable to owners or operators of non-transportation related onshore facilities engaged in storing or consuming oil when the facility has an above-ground storage capacity of no less than 1320 gallons of oil, in containers each with a shell capacity of 55 gallons or greater, and which, due to their location, could reasonably be expected to discharge oil in harmful quantities as defined in 40 C.F.R. Part 110.

60.     Pursuant to the SPCC Plan regulations, 40 C.F.R. § 112.3, the owner or operator of an onshore facility that has discharged or, due to its location, could reasonably be expected to discharge oil in harmful quantities into or upon the navigable waters of the United States or adjoining shorelines, must prepare an SPCC Plan in writing within six months after the date that such facility begins operations. The Plan must be in accordance with the requirements and guidelines set forth in the SPCC Plan regulations at 40 C.F.R. § 112.7.

61.     Pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat, 584, 599-60, and as provided in 40 C.F.R. §§ 19.2 and 19.4 (Table), any person who fails or refuses to comply with any regulation issued pursuant to Section 311(j) of the CWA, 33 U.S.C. § 1321(j),

17

including the SPCC requirements, shall be subject to a civil penalty in an amount up to $32,500 for each such violation occurring after March 15, 2004 through January 13, 2009; up to $37,500 for each such violation occurring after January 13, 2009 through November 2, 2015; and up to $48,192 for each such violation occurring after November 2, 2015, and assessed on or after January 13, 2020.

62.     Pursuant to Section 311(s) of the CWA, 33 U.S.C. § 1321(j), penalties collected under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), are paid to the Oil Spill Liability Trust Fund.

**Enforcement under the Texas Water Code**

63.     Section 7.101 of the Texas Water Code states that, "A person may not cause, suffer, allow, or permit a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute." Tex. Water Code § 7.101.

64.     Section 7.105(a) of the Texas Water Code states: "On the request of the executive director [of the TCEQ] or the commission, the attorney general shall institute a suit in the name of the state for injunctive relief …, to recover a civil penalty, or for both injunctive relief and a civil penalty." Tex. Water Code § 7.105(a).

65.     Section 7.102 of the Texas Water Code states, in pertinent part: "A person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit relating to any … matter within the commission's jurisdiction to enforce, other than violations of [chapters not relevant here], shall be assessed for each violation a civil penalty not less than $50 nor greater than $25,000 for each day of each violation as the court or jury considers proper. Each day of a continuing violation is a separate violation." Tex. Water Code § 7.102.

## GENERAL ALLEGATIONS

66.     Defendant began operations at the Facility in 1946.

67.     The Facility's Standard Industrial Classification ("SIC") Codes are 2865, 2869, and 2879. The Facility's North American Industrial Classification System ("NAICS") Codes are 325192, 325199, and 325320, which designates facilities that support cyclic organic crudes/intermediates, industrial organic chemicals, and agricultural chemicals.

68.     The Facility is located within the drainage area of the Houston Ship Channel and San Jacinto River. The Facility is bounded on the north and east by the San Jacinto Bay and on the south and west by other industrial landowners.

69.     From on or about January 15, 2008, through on or about January 24, 2008, inspectors from EPA's National Enforcement Investigation Center ("NEIC") conducted a multimedia compliance investigation at Defendant's Facility (the "Inspection").

70.     At the time of the Inspection, Defendant produced agrichemicals (pesticides, herbicides, and insecticides), organic chemicals (non-halogenated vinyl compounds), and inorganic chemicals (sulfuric acid and hydrofluoric acid) at the Facility.

71.     The production areas in use by DuPont at the Facility at the time of the Inspection consisted of agrichemicals for crop production (comprising Lannate/Agricultural Products Intermediates (API) and the Hexazinone-Herbicides Business Unit (HBU), hereinafter referred to as the "Lannate Process Area"); and packaging and industrial polymers (vinyl acetate (Plant A) and polyvinyl alcohol (Plant B), hereinafter referred to as the "Vinyls Process Area").

72.     On November 15, 2014, a leak of 23,000 pounds of methyl mercaptan in the Lannate Process Area caused the death of four workers. The Lannate Process Area was shut down following the accident while the incident was under investigation. In March 2016,

19

Defendant announced that it would permanently close the Lannate Process Area.

73.     Subject to a reasonable opportunity for additional investigation or discovery, on May 30, 2014, DuPont sold the vinyl acetate operations (Plant A and Plant B) to Kuraray America Inc., which continues to discharge wastes to the wastewater treatment system operated by DuPont. Also, by February 1, 2015, DuPont transferred its fluoroproducts operations to The Chemours Company FC, LLC, which continues to discharge wastewater to the wastewater treatment system operated by DuPont. Finally, The LYCRA Company LLC ("LYCRA") owns and operates a packaging and industrial polymers unit co-located at the Facility which also discharges wastewater to the wastewater treatment system operated by DuPont.

74.     In 2017, DuPont completed a merger with DOW Chemical Company which created the holding company DowDupont, Inc. DuPont remains the owner of the La Porte Facility.

**A.   General RCRA Allegations**

75.     At all times relevant to this civil action, Defendant's Facility operated numerous unlined "surface impoundments," as that term is defined by 30 Tex. Admin. Code § 335.1(154) [40 C.F.R. § 260.10], including the Equalization Basin, the North Aeration Basin, the South Aeration Basin, the Clean Water Ditch, the Thermal Basin, the Settling Basin and the Emergency Retention Basin.

76.     The State of Texas, through the TCEQ, issued Hazardous Waste Permit No. 50213 to the Defendant for the La Porte Facility on November 8, 1990, which authorized the Defendant to manage, treat and store hazardous waste in container storage areas and in tanks. The Permit has never authorized DuPont to store, treat or dispose of hazardous waste in any surface impoundment. The Permit was modified in 2012 and 2014 to include corrective action

requirements for specific surface impoundments and waste disposal units designated as solid waste management units (SWMUs) at the Facility, as well as annual groundwater reporting requirements documenting progress of corrective action for the various SWMUs pursuant to 30 Tex. Admin. Code § 335.167.

77.     The Equalization Basin, the North Aeration Basin, and the South Aeration Basin are part of the biological treatment system. These surface impoundments are all constructed similarly with concrete sides and clay bottoms. During the time period relevant to this action, wastewater was piped from various areas of the Facility into a wastewater header (the Headworks), discharged into the Equalization Basin and then proceeded to either the North or the South Aeration Basin. From the aeration basins, wastewaters flow to an in-ground clarifier for settling, and then into the nitrification tank.

78.     The Clean Water Ditch at the Facility is a wood-lined ditch system that runs through the Facility to collect storm water, cooling water, and wastewater from hydrofluoric acid processing.  It has occasionally also collected releases and spills from process areas. The normal flow of the Clean Water Ditch goes through the Thermal Basin and then through the Settling Basin.

79.     The Emergency Retention Basin at the Facility is an unlined in-ground basin that received discharged maintenance wastes, discharges from vacuum trucks, diversions of the Clean Water Ditch, and various other materials during the period covered by this civil action. The Emergency Retention Basin is pumped to the Headworks, leading to the Equalization Basin.

80.     At all times relevant to this action, Defendant did not have a permit or interim status for the treatment, storage, or disposal of hazardous waste in a surface impoundment at the Facility.

21

81.     At all times pertinent to this action, Defendant piped process wastewaters from throughout the plant to one of seven tanks or the Headworks. The tanks receiving process wastewaters include, among others, the North Day Tank and the South Day Tank.

82.     At all times relevant to this action, Defendant operated as a large quantity generator of hazardous waste under RCRA, and it notified EPA and TCEQ as such pursuant to 30 Tex. Admin. Code §§ 335.6(c) (Notice of Registration) and 335.9(a)(2) (Annual Waste Summary).

83.     At all times relevant to this action, Defendant was an owner and/or operator and controlled the day-to-day business of the Facility, within the meaning of 30 Tex. Admin. Code § 335.1(114) and (115) [40 C.F.R. § 260.1].

84.     The United States and the State allege that because DuPont engaged in activities that required an operating permit (e.g., disposal of hazardous waste), DuPont violated requirements found in Part 264 or, alternatively, Part 265 if any of those activities gave rise to interim status eligibility.

**B.   General Clean Air Act Allegations**

85.     From 1946 until the transfer of the Plant A and Plant B to Kuraray Co., Ltd., in May 2014, Defendant was the "owner" and "operator," as those terms are defined in Sections 111(a)(5) and 112(a)(9) of the CAA, 42 U.S.C. §§ 7411(a)(5) and 7412(a)(9), and 40 C.F.R. §§ 60.2 and 63.2, of Plant A and Plant B of the Facility.

**C.   General Clean Water Act Allegations**

86.     At all times pertinent to this civil action, the Facility was a non-transportation-related onshore facility within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2, engaged in storing or consuming oil in (a) above-ground

tanks with a capacity of no less than 1320 gallons, or (b) in containers each with a shell capacity of 55 gallons or greater, and which, due to the Facility's location, could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. Part 110, to the San Jacinto Bay.

87.     Pursuant to Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), and 40 C.F.R. § 112.1, at all times pertinent to this action, the Facility was an SPCC-regulated facility.

88.     Pursuant to Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), and 40 C.F.R. § 112.1, at all times pertinent to this civil action, Defendant, as the owner of an SPCC-regulated facility within the meaning of Section 311(a)(6), 33 U.S.C. § 1321(a)(6), and 40 C.F.R. § 112.2, was subject to the SPCC regulations.

89.     The Facility's SPCC Plan in place at the time of the Inspection was certified in December 2004.  The Facility has amended its SPCC Plan numerous times since the Inspection, most recently in April 2017.

90.     Pursuant to 40 C.F.R § 112.3, the owner or operator of an SPCC-regulated facility must have fully implemented its SPCC Plan in accordance with 40 C.F.R. § 112.7 and any other applicable section of 40 C.F.R. Part 112.

### FIRST CLAIM FOR RELIEF – RCRA
(Failure to make hazardous waste determination
for solid wastes generated from Process Tank)

91.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

92.     Pursuant to 30 Tex. Admin. Code § 335.62 [40 C.F.R. § 262.11], a person who generates a solid waste, as defined in 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2],[1] must determine if that waste is hazardous pursuant to 30 Tex. Admin. Code § 335.504, either by

---

[1]  In the claims brought pursuant to RCRA, citations to the Code of Federal Regulations are as published at the time of the RCRA violations alleged.

applying the required test method or by applying his or her knowledge of the hazardous characteristic of the waste in light of the materials or the process used.

93.     At the time of the Inspection, the Process Tank was located in the Vinyls Process Area.

94.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, polyvinyl acetate and methanol entered the Process Tank, and, polyvinyl alcohol, a product, and methanol, a waste, exited the Process Tank.

95.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, a material accumulated on the walls of the Process Tank. Approximately every six weeks, the material was removed from the walls of the Process Tank by rinsing the Process Tank with hot water and draining the hot water mixture to a Waste Tank. From there, the liquid waste stream was disposed into the Equalization Basin and the solid residue waste stream was disposed into the Emergency Retention Basin.

96.     Pursuant to 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2], the material removed from the Process Tank to be accumulated, stored, or processed (treated) in the Waste Tank, before disposal in the Equalization Basin and Emergency Retention Basin, was a solid waste.

97.     From at least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant was required to make hazardous waste determinations whenever new batches of solid waste were generated in accordance with 30 Tex. Admin. Code §§ 335.62 and 335.504 [40 C.F.R. § 262.11].

24

98.    Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant failed to make an adequate hazardous waste determination for the Process Tank rinse waste, in violation of 30 Tex. Admin. Code §§ 335.62 and 335.504 [40 C.F.R. § 262.11]. Defendant also violated 30 Tex. Admin. Code § 335.70 [40 C.F.R. § 262.40(c)] by failing to keep a record of its hazardous waste determinations for at least three years from the date that the waste was last sent to an on-site or off-site storage, processing or disposal facility.

99.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for civil penalties for each such violation.

100.    Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

## SECOND CLAIM FOR RELIEF – RCRA
(Failure to make and keep record of hazardous waste determination
for solid wastes generated from the Plant A process unit)

101.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

102.    At the time of the Inspection, a process unit in the Vinyls Plant A process area generated a wastewater contaminated with vinyl acetate.

103.    Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, wastewater contaminated with vinyl acetate flowed to the Water Stripper Waste Tank, from which volatiles were vented to a flare for disposal, and the remaining material was piped to the Waste Holding Pond (an unpermitted surface impoundment) for storage or disposal, after which it was injected into an underground injection control well.

25

104.     On at least two occasions, DuPont's testing of wastewater discharged from the Waste Holding Pond prior to disposal in the underground injection control well indicated that the wastewater from the Waste Holding Pond was a regulated hazardous waste that exhibited the characteristic of ignitability.

105.     Pursuant to 30 Tex. Admin. Code § 335.1(67) [40 C.F.R. § 260.10] and 30 Tex. Admin. Code § 335.1(146) [40 C.F.R. § 261.2], Defendant generated a solid waste by removing wastewater contaminated with vinyl acetate from the Vinyls Plant A process unit to be accumulated, stored, or processed (treated) in the Water Stripper Waste Tank before disposal in the Waste Holding Pond.

106.     Because the wastewater contaminated with vinyl acetate was a solid waste, Defendant was required to make a hazardous waste determination at the time the solid waste was generated prior to discharging the wastewater into the Waste Holding Pond, in accordance with 30 Tex. Admin. Code §§ 335.62 and 335.504 [40 C.F.R. § 262.11], and was required to maintain records of that hazardous waste determination for at least three years from the date that the waste was last sent to an on-site or off-site treatment, storage, or disposal facility in accordance with 30 Tex. Admin. Code § 335.70(a) and (c) [40 C.F.R. § 262.40(c)].

107.     Defendant has provided no record of making a hazardous waste determination for this waste stream. Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant failed to make hazardous waste determinations for this waste stream as required, in violation of  30 Tex. Admin. Code §§ 335.62, 335.70(a) and (c), and 335.504 [40 C.F.R. §§ 262.11 and 262.40(c)].

108.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),

Defendant is liable to the United States for civil penalties for each violation identified above.

109.     Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water

Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these

violations.

## <u>THIRD CLAIM FOR RELIEF - RCRA</u>
(Storage, Treatment or Disposal of Hazardous Waste in the
Clean Water Ditch without a Hazardous Waste Permit)

110.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

111.     Pursuant to Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and

30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)], hazardous waste shall

not be stored, processed (treated), or disposed of without a permit.

112.     On October 31, 2005, according to DuPont's contemporaneous report, DuPont

discharged into the Clean Water Ditch a liquid waste stream from the API Process Area

containing approximately three hundred pounds of methylene chloride, which is a F002

hazardous waste listed for toxicity.

113.     DuPont's records show that the methylene chloride from the October 31, 2005,

disposal in the Clean Water Ditch was diverted to the Emergency Retention Basin.

114.     From at least October 31, 2005 through the present, Defendant has had neither a

permit nor interim status for its storage, processing (treatment), or disposal of listed hazardous

waste [F002] in the Clean Water Ditch, in violation of Sections 3005(a) and (e) of RCRA, 42

U.S.C. §§ 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R.

§ 270.1(c)].

115.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),

Defendant is liable to the United States for injunctive relief and civil penalties for the

unpermitted disposal of F002 hazardous waste in the Clean Water Ditch.

116.   Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

### FOURTH CLAIM FOR RELIEF – RCRA
(Disposal of F002 Listed Hazardous Waste into the Clean Water
Ditch in violation of the Land Disposal Prohibition)

117.   Paragraphs 1 through 90 are realleged and incorporated herein by reference.

118.   30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations contained in 40 C.F.R. Part 268.  Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. pt. 268] and Section II.A.7 of Hazardous Waste Permit No. 50213, F002 hazardous waste is prohibited from land disposal unless the applicable treatment standards of 40 C.F.R. Part 268, Subpart D are met. 40 C.F.R. § 268.40(a) further provides that a prohibited waste in the table "Treatment Standards for Hazardous Wastes" may be land disposed only if it meets the requirements found in the table.

119.   Placement of hazardous waste into a surface impoundment constitutes land disposal within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

120.   On October 31, 2005, Defendant disposed of F002, a listed hazardous waste, into the Clean Water Ditch without treating the waste to the applicable treatment standard, in violation of the land disposal prohibition of 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. § 268.40] and Section II.A.7 of Hazardous Waste Permit No. 50213. The Clean Water Ditch remains in use at the Facility.

121.   Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for injunctive relief and civil penalties for  such

violation.

122.     Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

### FIFTH CLAIM FOR RELIEF - RCRA
(Storage, Treatment or Disposal of Hazardous Waste in the
Emergency Retention Basin without a Hazardous Waste Permit)

123.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

124.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, about every two weeks DuPont used a vacuum truck to collect cleanout material from the plate and frame heat exchangers and then discharged the cleanout material from the vacuum truck to the Emergency Retention Basin. The cleanout material contained K156 and K157 hazardous wastes. Additionally, as described above, on or about October 31, 2005, the F002 listed hazardous waste (methylene chloride) that had spilled into the Clean Water Ditch was diverted to the Emergency Retention Basin for storage and disposal.

125.     Thus, DuPont stored, processed (treated), or disposed of listed hazardous waste in the Emergency Retention Basin.

126.     From at least October 31, 2005, through the present, Defendant has had neither a permit nor interim status for its storage, processing (treatment), or disposal of hazardous waste in the Emergency Retention Basin in violation of Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)].

127.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for injunctive relief and civil penalties for each

unpermitted disposal of hazardous waste in the Emergency Retention Basin.

128.    Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

**SIXTH CLAIM FOR RELIEF – RCRA**
(Disposal of K156 and K157 and F002 listed hazardous wastes into the
Emergency Retention Basin in violation of the Land Disposal Prohibition)

129.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

130.    30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations contained in 40 C.F.R. Part 268. Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. pt. 268] and Section II.A.7 of Hazardous Waste Permit No. 50213, listed K156, K157, and F002 hazardous wastes are prohibited from land disposal unless the applicable treatment standards of 40 C.F.R. Part 268, Subpart D are met. 40 C.F.R. § 268.40(a) further provides that a prohibited waste in the table "Treatment Standards for Hazardous Wastes" may be land disposed only if it meets the requirements found in the table.

131.    Placement of hazardous waste in a surface impoundment constitutes land disposal within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

132.    Defendant disposed of F002 listed hazardous wastes from the methylene chloride spill on October 31, 2005, into the Emergency Retention Basin without treating the waste to the applicable treatment standards as prescribed in 40 C.F.R. §§ 268.39(f) and 268.40.  Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant disposed of K156 and K157 listed hazardous wastes, vacuumed and removed biweekly from the plate and frame heat exchangers, into the Emergency Retention Basin without treating the waste to the applicable

30

treatment standards as prescribed in 40 C.F.R. §§ 268.39(f) and 268.40.

133.    Subject to a reasonable opportunity for further investigation or discovery, on October 31, 2005, and biweekly at least from the date of Inspection through the shutdown of the Lannate Process Area, Defendant disposed of hazardous waste in the Emergency Retention Basin in violation of 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R. § 268.39(a)] and Section II.A.7 of Hazardous Waste Permit No. 50213.

134.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for injunctive relief and civil penalties for each such violation.

135.    Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

### SEVENTH CLAIM FOR RELIEF - RCRA
(Storage, Treatment or Disposal of Hazardous Waste in the Equalization Basin,
North Aeration Basin and South Aeration Basin without a Hazardous Waste Permit)

136.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

137.    Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, the Equalization Basin contained, *inter alia*, a mixture of liquid waste material from the North Day Tank, the South Day Tank, and the Emergency Retention Basin.

138.    The waste stream from the North Day Tank that entered the Equalization Basin contained K156 and K157 listed hazardous wastes that originated in the Lannate Process Area and were treated in the TC Stripper Unit before entering the North Day Tank.

139.    The waste stream from the South Day Tank that entered the Equalization Basin

contained K156 and K157 listed hazardous wastes that originated in the Lannate Process Area and were treated in the TC Stripper Unit before entering the South Day Tank.

140.     The wastewater in the Emergency Retention Basin that enters the Equalization Basin contained K156 and K157 listed hazardous wastes as well as F002 listed hazardous waste.

141.     Wastewaters in the Equalization Basin flow into the North Aeration Basin and/or the South Aeration Basin.

142.     Defendant stored, processed (treated), or disposed of listed hazardous waste in the Equalization Basin, the North Aeration Basin and the South Aeration Basin.

143.     From at least the time of the Inspection until the present, Defendant has had neither a permit nor interim status for its storage, processing (treatment), or disposal of hazardous waste in the Equalization Basin and the North and South Aeration Basins in violation of Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)].

144.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for injunctive relief and civil penalties for each such violation.

145.     Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

**EIGHTH CLAIM FOR RELIEF – RCRA**
(Disposal of K156 and K157 and F002 listed hazardous waste into the Equalization Basin, North Aeration Basin and South Aeration Basin in violation of the Land Disposal Prohibition)

146.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

147.     30 Tex. Admin. Code § 335.431(c)(1) adopts by reference the regulations

contained in 40 C.F.R. Part 268. Pursuant to 30 Tex. Admin. Code § 335.431(c)(1) [40 C.F.R.

Part 268] and Section II.A.7 of Hazardous Waste Permit No. 50213, K156, K157, and F002

hazardous wastes are prohibited from land disposal unless the applicable treatment standards of

40 C.F.R. Part 268, Subpart D are met. 40 C.F.R. § 268.40(a) further provides that a prohibited

waste in the table "Treatment Standards for Hazardous Wastes" may be land disposed only if it

meets the requirements found in the table.

148.    Placement of hazardous waste in a surface impoundment constitutes land disposal

within the meaning of that term as set forth at 40 C.F.R. § 268.2(c).

149.    Subject to a reasonable opportunity for further investigation or discovery, from at

least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant

disposed of K156 and K157 listed hazardous wastes from the North Day Tank and South Day

Tank into the Equalization Basin without treating the waste to the applicable treatment standards

as prescribed in 40 C.F.R. §§ 268.39(f) and 268.40.

150.    Additionally, hazardous waste disposed into the Emergency Retention Basin

flows into the Equalization Basin without being treated to the applicable treatment standards as

prescribed in 40 C.F.R. §§ 268.39(f) and 268.40.

151.    Hazardous wastes in the Equalization Basin flow into the North Aeration Basin

and South Aeration Basin.

152.    Subject to a reasonable opportunity for further investigation or discovery, from at

least the time of the Inspection until Defendant closed its Lannate Process Area, Defendant

disposed of K156 and K157 and F002 hazardous wastes into the Equalization Basin, North

Aeration Basin and South Aeration Basin, in violation of 30 Tex. Admin. Code § 335.431(c)(1)

[40 C.F.R. § 268.39] and Section II.A.7 of Hazardous Waste Permit No. 50213.

153.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for injunctive relief and civil penalties for each such violation.

154.     Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

### NINTH CLAIM FOR RELIEF - RCRA
(Storage, Treatment or Disposal of Hazardous Wastes in the
Alcoholysis Kettle Drip Tank without a Hazardous Waste Permit)

155.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

156.     The Alcoholysis Kettle Drip Tank, a waste tank located in the Plant B Vinyls Process Area of the Facility, stored a waste stream that dripped into it from the valves around a process tank.

157.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant ceased using it for storage of the waste stream, the Alcoholysis Kettle Drip Tank contained a characteristic hazardous waste (D001 – characteristic of ignitability). The tank was unlabeled, lacked secondary containment, and allowed methanol emissions to the atmosphere. Subject to a reasonable opportunity for additional investigation or discovery, DuPont ceased using the Alcoholysis Kettle Drip Tank in this manner on or about December 2, 2010.

158.     From at least the time of the Inspection until the present, Defendant had neither a permit nor interim status for its storage of hazardous waste in the Alcoholysis Kettle Drip Tank, in violation of Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and 30 Tex. Admin. Code §§ 335.2(a) and 335.43(a) [40 C.F.R. § 270.1(c)].

34

159.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),

Defendant is liable to the United States for civil penalties for each such violation.

160.     Pursuant to Sections 7.101, 7.102, and 7.105 of the Texas Water Code, Tex.

Water Code §§ 7.101, 7.102, and 7.105, Defendant is also liable to the State for civil penalties

for these violations.

### TENTH CLAIM FOR RELIEF – RCRA
(Failure to Comply with 40 C.F.R. Parts 264 and 265, Subpart CC
requirements for the Alcoholysis Kettle Drip Tank)

161.     Paragraphs 1 through 90 are realleged and incorporated by reference.

162.     30 Tex. Admin. Code §§ 335.151(b), 335.152(a)(19), 335.111(a), and

335.112(a)(21) [40 C.F.R. §§ 264.1080(a) and 265.1080(a)] provide that 40 C.F.R. Parts 264

(Subpart CC) and 265 (Subpart CC) apply to owners and operators of all facilities that process

(treat), store, or dispose of hazardous waste in tanks, surface impoundments, or containers

subject to either 40 C.F.R. Parts 264 (Subparts I, J, or K) or 265 (Subparts I, J, or K).

163.     40 C.F.R. §§ 264.1083(b), 264.1085, 265.1083(b) and 265.1085 require that

owners and operators control air pollutant emissions from all hazardous waste tanks according to

specific control measures.

164.     The Alcoholysis Kettle Drip Tank was a tank system used for storing or treating

hazardous waste, within the meaning of 40 C.F.R. §§ 264.190 and 265.190, and was therefore

subject to 40 C.F.R. Parts 264 (Subpart J) and 265 (Subpart J) and 40 C.F.R. Parts 264 (Subpart

CC) and 265 (Subpart CC). "Tank system" is also defined at 30 Tex. Admin. Code § 335.1(156).

165.     Subject to a reasonable opportunity for further investigation or discovery, from at

least the date of the Inspection through December 2, 2010, when it was taken out of service, the

Alcoholysis Kettle Drip Tank did not meet control measure requirements and was open to the

atmosphere. Because the Tank was not in compliance with the required air pollution control measures, Defendant failed to meet the applicable requirements of 40 C.F.R. Parts 264 (subpart CC) and 265 (Subpart CC), in violation of 40 C.F.R. §§ 264.1080(a) and 265.1080(a) and 30 Tex. Admin. Code §§ 335.151(b), 335.152(a)(19), 335.111(a), and 335.112(a)(21).

166.    Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Defendant is liable to the United States for civil penalties for each such violation.

167.    Pursuant to Sections 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102, and 7.105, Defendant is also liable to the State for civil penalties for these violations.

### ELEVENTH CLAIM FOR RELIEF - RCRA
(Failure to have Financial Assurance for corrective action and
closure of solid waste and hazardous waste management units)

168.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

169.    Pursuant to 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a) [40 C.F.R. §§ 264.101, 264.143 and 265.143], the owner and operator of a hazardous waste processing (treatment), storage or disposal facility must establish financial assurance for corrective actions and closure of the facility. The owner or operator must choose from the options set forth in 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a) [40 C.F.R. §§ 264.143(a)-(f) and 265.143(a)-(f)].

170.    Subject to a reasonable opportunity for further investigation or discovery, DuPont has not established financial assurance for the corrective action or for closure of the Clean Water Ditch, Emergency Retention Basin, Equalization Basin, North Aeration Basin, and South Aeration Basin, in violation of 30 Tex. Admin. Code §§ 37.6021, 335.179(b), and 335.128(a) [40 C.F.R. §§ 264.101, 264.143 and 265.143].

36

171.     Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g),

Defendant is liable to the United States for injunctive relief and civil penalties for each such

violation.

172.     Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code,

Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for

injunctive relief and civil penalties for these violations.

**TWELFTH CLAIM FOR RELIEF – CAA**
(Failure to Comply with PAI MACT Standards at Lannate Process –
Failure to Control Process Vent and Inaccurate NOCS)

173.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

174.     Subject to a reasonable opportunity for further investigation or discovery, from at

least the time of the Inspection until Defendant closed its Lannate Process Area, DuPont

manufactured the insecticide Lannate (methomyl).

175.     At the time of the Inspection, uncontrolled HAP emissions from DuPont's

Lannate process vents exceeded 0.15 Mg/yr.

176.     On June 1, 2004, DuPont submitted to EPA a PAI MACT Notification of

Compliance Status report ("2004 NOCS") required under the PAI MACT regulations found at

40 C.F.R. Part 63, Subpart MMM.

177.     Subject to a reasonable opportunity for further investigation or discovery, from at

least the time of the Inspection until Defendant closed its Lannate Process Area, DuPont used a

compressor and condenser to recover methylene chloride for reuse in the Lannate production

process. The vent stream from the recovery condenser was released directly to the atmosphere.

178.     The vent stream from the methylene chloride recovery condenser to the

atmosphere was a process vent as defined in 40 C.F.R. § 63.1361, and was subject to the process

vent control requirements of 40 C.F.R. § 63.1362(b).

179.    Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, the process vent stream from the Lannate process methylene chloride recovery condenser to the atmosphere was not controlled and was not identified as a process vent in the 2004 NOCS.

180.    DuPont's failure to control the recovery condenser process vent was a violation of 40 C.F.R. § 63.1362(b); 30 Tex. Admin. Code §§ 101.20(2), 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Subject to a reasonable opportunity for further investigation or discovery, this violation and resulting emissions of HAPs to the atmosphere likely continued until closure of the Lannate Process Area.

181.    The NOCS requirements of 40 C.F.R. § 63.1368(a) and (f) incorporate by reference the NOCS requirements of 40 C.F.R. § 63.9(h)(2)(i), which are also incorporated by reference at 30 Tex. Admin. Code § 113.100.  DuPont's failure to include the recovery condenser process vent in its 2004 NOCS was a violation of the NOCS requirements in 40 C.F.R. § 63.1368(a) and (f) and 40 C.F.R. § 63.9(h)(2)(i)(F), and DuPont's failure to correct the 2004 NOCS once it became aware of its inaccuracy was a violation of 40 C.F.R. § 63.1368(h); 30 Tex. Admin. Code §§ 113.100, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).  Subject to a reasonable opportunity for further investigation or discovery, Defendant's violations of NOCS requirements continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

182.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

183.    Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water

Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

### THIRTEENTH CLAIM FOR RELIEF - CAA
(Failure to comply with PAI MACT at Lannate Process –
Violation of Emissions Limits and Inaccurate NOCS)

184.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

185.    At the time of the Inspection, the 2004 NOCS for the Lannate process stated that the Lannate process was one of seven processes that share some of the same equipment, including the Lannate and methyl isocyanate ("MIC") incinerators, the methylene chloride compressor and condenser system, and certain chlorine and caustic scrubbers.

186.    At the time of the Inspection, the Lannate process equipment was all part of a single "process" as that term is defined under 40 C.F.R. § 63.1361.

187.    40 C.F.R. § 63.1362(b)(3) provides that, for each process, the owner or operator of existing sources of HCl and $Cl_2$ emissions must comply with requirements of either subparagraph 63.1362(b)(3)(i) or 63.1362(b)(3)(ii).  40 C.F.R. § 63.1362(b)(3)(i) provides: "The uncontrolled HCl and $Cl_2$ emissions, including HCl generated from the combustion of halogenated process vent emissions, from the sum of all process vents within a process shall not exceed 6.8 Mg/yr."  40 C.F.R. § 63.1362(b)(3)(ii) provides: "HCl and $Cl_2$ emissions, including HCl generated from combustion of halogenated process vent emissions, from the sum of all process vents within a process shall be reduced by 94 percent or greater or to outlet concentrations less than or equal to 20 ppmv."

188.    The 2004 NOCS for the Lannate process stated that DuPont would comply with 40 C.F.R. § 63.1362(b)(3)(i) at the MIC incinerator, by emitting less than 6.8 Mg/yr (7.5 tons per year) of HCl, and elsewhere in the process would comply with 40 C.F.R. § 63.1362(b)(3)(ii), by

39

using scrubbers to reduce $Cl_2$ emissions by at least 94%.

189.     Thus, DuPont divided the single Lannate process into sections and used different compliance options for each section of the process. DuPont used 40 C.F.R. § 63.1362(b)(3)(ii) as the compliance option for streams that contained $Cl_2$. DuPont used 40 C.F.R. § 63.1362(b)(3)(i) as the compliance option for the streams that contained HCl.

190.     Because the HCl and $Cl_2$ emissions were being generated as part of the same Lannate process, DuPont could not use different compliance options for different parts of the same process. DuPont was required to show either that the sum of all HCl and $Cl_2$ emissions was not greater than 6.8 Mg/yr (7.5 tons per year) or that it met a minimum 94% destruction efficiency for the sum of all process vent emissions. The use of a combination of compliance options could result in the exceedance of the emissions limitations in either or both options for "the sum of all process vents" within the Lannate process.

191.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, the Lannate incinerator also received methylene chloride from the Lannate process and emitted HCl. DuPont did not identify this HCl vent stream in its 2004 NOCS.

192.     DuPont conducted a performance test on the Lannate incinerator in August 2003. During this test, DuPont injected $Cl_2$ into the incinerator to determine vent stream emissions of $Cl_2$ and HCl.  But DuPont did not use methylene chloride as an input and so did not demonstrate an emission rate or destruction efficiency for the HCl formed when methylene chloride is incinerated (the actual process). Therefore, the performance test was inadequate. DuPont did not demonstrate compliance with either an emissions rate or a destruction efficiency for the HCl formed when methylene chloride is incinerated at the Lannate incinerator. DuPont could not

40

determine an emission rate for HCl from the test and could not demonstrate that the HCl formed is controlled to at least 94%, as required by 40 C.F.R. § 63.1362(b)(3).

193.    Subject to a reasonable opportunity for additional investigation or discovery, DuPont failed to meet either the 6.8 Mg/yr (7.5 tons per year) emission limit or the 94% destruction efficiency requirement for the sum of all process vents within the Lannate process, in violation of 40 C.F.R. § 63.1362(b)(3); 30 Tex. Admin. Code §§ 101.20(2), 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Subject to a reasonable opportunity for further investigation or discovery, this violation and resulting emissions of HAPs to the atmosphere likely continued from at least the time of the Inspection until closure of the Lannate Process Area.

194.    Subject to a reasonable opportunity for further investigation or discovery, DuPont failed to properly test the Lannate incinerator's HCl destruction efficiency in violation of 40 C.F.R. §§ 63.1362(b) and 63.1365(c); 30 Tex. Admin. Code §§ 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

195.    DuPont failed in its 2004 NOCS to state or demonstrate compliance with either compliance option (6.8 Mg/yr emission limit or 94% destruction efficiency) for the Lannate process, in violation of NOCS requirements in 40 C.F.R. § 63.1368(a) and (f) and 40 C.F.R. § 63.9(h)(2)(i)(G), and it failed to correct such information once it became aware of its inaccuracy, in violation of 40 C.F.R. § 63.1368(h); 30 Tex. Admin. Code §§ 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Subject to a reasonable opportunity for further investigation or discovery, Defendant's violations of NOCS requirements continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

41

196.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

197.     Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

## FOURTEENTH CLAIM FOR RELIEF - CAA
(Failure to comply with PAI MACT for wastewater streams at Lannate Process)

198.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

199.     The PAI MACT at 40 C.F.R. § 63.1362(d), requires owners or operators of an affected source to meet wastewater requirements set forth in 40 C.F.R. §§ 63.132-63.147, except as differentiated by 40 C.F.R. § 63.1362(d).

200.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, the Lannate process wastewaters included methylene chloride, acetonitrile, and toluene, which are compounds regulated under 40 C.F.R. § 63.132(a)(1) and 40 C.F.R. Part 63, Subpart G, Table 9. These provisions require that DuPont determine whether its wastewater streams require controls for compounds designated in Table 9 and, if so, whether the wastewater streams are classified as Group 1 or Group 2 wastewater streams.

201.     During the Inspection, NEIC Inspectors identified at least eight wastewater streams from the Lannate process.

202.     DuPont's 2004 NOCS designated wastewater streams from the Lannate process as Group 1 streams generally, but it did not identify where each wastewater stream was generated or how many wastewater streams were generated from the Lannate process, and it failed to

42

provide data from the point of determination to demonstrate how its Group 1 determination

conformed to the procedures for determining a Group 1 or Group 2 stream under 40 C.F.R.

§ 63.132(a)(1), (c) or (e).

203.    The 2004 NOCS submitted by DuPont also did not identify which wastewater

streams need to be controlled for Table 9 compounds, in violation of 40 C.F.R.

§§ 63.9(h)(2)(i)(A), 63.132(a)(1), 63.146(b)(2), and 63.1368(a); 30 Tex. Admin. Code

§§ 113.100, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section

382.085(b).

204.    DuPont's 2004 NOCS stated that, except for the Water Detention Tank, all other

tanks in the Environmental Control Area were Group 1 wastewater tanks that were controlled by

the Lannate Incinerator.

205.    The TC Tank is a wastewater tank that received a Group 1 wastewater stream.

206.    The PAI MACT requires that all wastewater tanks receiving a Group 1

wastewater stream comply with inspection requirements set forth in Table 11 of the HON.

40 C.F.R. §§ 63.143(a) and 63.148(a); 40 C.F.R. Part 63, Subpart G, Table 11.

207.    Subject to a reasonable opportunity for further investigation or discovery, from at

least the time of the Inspection until Defendant closed its Lannate Process Area, DuPont did not

conduct the required inspections of the TC Tank, in violation of 40 C.F.R. § 63.143(a); 40 C.F.R.

§ 63.148(a); 40 C.F.R. Part 63, Subpart G, Table 11; 40 C.F.R. § 63.1362(d); 30 Tex. Admin.

Code §§ 115.144(1)(A), 113.120, 113.700, 116.115(c), and 122.143(4); and Texas Health and

Safety Code Section 382.085(b).

208.    The 2004 NOCS submitted by DuPont had no monitoring plan for the TC Tank,

in violation of 40 C.F.R. §§ 63.9(h)(2)(i)(C) and 63.1368(a); 30 Tex. Admin. Code §§ 113.100,

113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

209.     Subject to a reasonable opportunity for further investigation or discovery, Defendant's violations of NOCS requirements described above continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

210.     Subject to a reasonable opportunity for further investigation or discovery, from at least the time of the Inspection until Defendant closed its Lannate Process Area, DuPont did not manage its Group 1 wastewater streams as required by the regulations at 40 C.F.R. §§ 63.132-63.147. These violations and the resulting emission of HAPs to the atmosphere likely continued until closure of the Lannate Process Area.

211.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

212.     Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

## FIFHTEENTH CLAIM FOR RELIEF - CAA
(Failure to meet PAI MACT Requirements at TC Stripper –
Inaccurate NOCS and Failure to Conduct Performance Test)

213.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

214.     At the time of the Inspection, the wastewater stream from the Lannate process' TC Tank was fed to a device called the TC Stripper. The TC Stripper removed and condensed some organic chemicals from the wastewater stream. The condensed liquid from the top of the TC Stripper was collected into a decanter, which acted as an oil/water separator. The organic layer of the decanter was shipped offsite for incineration, and the aqueous layer was returned to the TC Tank via a dry sump. Non-condensable vapors containing HAPs were vented to the

Lannate Incinerator for destruction. When the Lannate Incinerator was not operating, Defendant used carbon absorbers to control vapors from the TC Stripper. Wastewater from the TC Stripper was either sent back through the TC Stripper for reprocessing, sent offsite for incineration, or sent to the Facility's biological treatment system.

215. Under the PAI MACT, a "waste management unit" is defined as "the equipment … and/or device(s) used to convey, store, treat, or dispose of wastewater streams or residuals…. Examples of equipment that may be waste management units include … oil-water separators or organic-water separators, or organic removal devices such as decanters, strippers, or thin-film evaporation units."  40 C.F.R. § 63.1361.

216. At the time of the Inspection, the TC Stripper, associated condensers, and vapor-liquid separator were waste management units that treated a "Group 1 wastewater stream" as defined by 40 C.F.R. § 63.1361, and were subject to the PAI MACT wastewater requirements at 40 C.F.R. §§ 63.1362(d) and, by reference, 63.132-63.147.

217. In its 2004 NOCS, DuPont failed to identify the TC Stripper as a waste management unit, in violation of 40 C.F.R. § 63.146(b)(5). DuPont also thereby violated 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 113.120, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

218. The TC Stripper, associated condensers, vapor-liquid separator, carbon absorber, and the biological treatment system constituted a series of treatment processes for a Group 1 wastewater stream.

219. In its 2004 NOCS, DuPont failed to identify the combination of the TC stripper, associated condensers, vapor-liquid separator, carbon absorber, and the biological treatment system as a series of treatment processes for the Group 1 wastewater stream, in violation of

45

40 C.F.R. § 63.138(a)(7)(i)(C), and it failed to correct such information once it became aware of its inaccuracy, in violation of 40 C.F.R. § 63.1368(h). DuPont was also in violation of 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 113.120, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

220.    In its 2004 NOCS, DuPont failed to attest to its compliance with 40 C.F.R. § 63.139 (PAI MACT standards for wastewater control devices) at the TC Stripper, carbon absorber, condensers, and vapor-liquid separator associated with the TC Stripper, as required by 40 C.F.R. § 63.9(h)(2)(i)(G), and it failed to correct such information once it became aware of its inaccuracy, in violation of 40 C.F.R. § 63.1368(h). DuPont was also in violation of 40 C.F.R. §§ 63.1362(d) and 1368(d); 30 Tex. Admin. Code §§ 113.100, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

221.    Subject to a reasonable opportunity for further investigation or discovery, Defendant's violations of NOCS requirements described above continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

222.    DuPont failed to conduct a performance test or design evaluation to determine compliance from the "inlet" to the "outlet" point across the TC Stripper, associated condensers, vapor-liquid separator, and the biological treatment system processes, in violation of 40 C.F.R. §§ 63.138(a)(7)(i)(D) and 63.145(a)(7). DuPont also thereby violated 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 113.120, 113.700, 116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Subject to a reasonable opportunity for further investigation or discovery, the violations and the resulting emission of HAPs to the atmosphere continued at least until such time as either DuPont completed the performance test, the biological treatment system was upgraded to an enhanced biological treatment system, or until closure of the Lannate Process

Area.

223.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

224.     Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

**SIXTEENTH CLAIM FOR RELIEF - CAA**
(Failure to comply with PAI MACT requirements at the North<br>Day Tank and South Day Tank, and Inaccurate NOCS)

225.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

226.     At the time of the Inspection, the Group 1 wastewater stream from the TC Stripper was collected in one of two tanks: the North Day Tank or the South Day Tank.

227.     The North Day Tank and South Day Tank are fixed-roof tanks that vent directly to the atmosphere. These wastewater tanks were used to manage a Group 1 wastewater stream and were subject to requirements found in 40 C.F.R. § 63.133.

228.     The North Day Tank and South Day Tank vented directly to the atmosphere rather than to a control device, in violation of 40 C.F.R. § 63.133(a)(2)(i) and (b)(2). DuPont also thereby violated 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 106.4(a)(6), 113.120, 113.700, and 122.143(4); and Texas Health and Safety Code Section 382.085(b). This violation and the resulting emission of HAPs to the atmosphere likely continued until closure of the Lannate Process Area.

229.     DuPont incorrectly represented in its 2004 NOCS that it managed the Group 1 storage tanks by venting to the Lannate Vapor Incinerator in compliance with 40 C.F.R. 63.133(a)(2)(i), when in fact the North Day Tank and South Day Tank vented directly to the

47

atmosphere, in violation of NOCS requirements in 40 C.F.R. § 63.1368(a) and (f) and 40 C.F.R.

§ 63.9(h)(2)(i)(G). DuPont failed to correct the misinformation once it became aware of its

inaccuracy, in violation of 40 C.F.R. § 63.1368(h); 30 Tex. Admin. Code §§ 113.700,

116.115(c), and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Defendant's

violations of NOCS requirements described above continued until the 2004 NOCS was corrected

or until closure of the Lannate Process Area.

230.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable

to the United States for civil penalties for each such violation.

231.    Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water

Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these

violations.

**SEVENTEENTH CLAIM FOR RELIEF - CAA**
(Failure to Comply with PAI MACT at Biological Treatment Unit)

232.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

233.    At the time of the Inspection, DuPont tested wastewater from the North and South

Day Tanks for methylene chloride content. If the methylene chloride content was greater than 5

ppmv, the material was returned to the TC Tank and reprocessed. If the methylene chloride

content was less than 5 ppmv, the wastewater was mixed with other wastewaters and treated in

DuPont's biological treatment system, which consists of two-stage activated sludge processing.

234.    The PAI MACT defines "enhanced biological treatment system or enhanced

biological treatment process" as "an aerated, thoroughly mixed treatment unit(s) that contains

biomass suspended in water followed by a clarifier that removes biomass from the treated water

and recycles recovered biomass to the aeration unit.…" 40 C.F.R. § 63.111

48

235.     The first part of DuPont's biological treatment process is a 1.4 million gallon Equalization Basin with activated sludge. Liquid exiting the Equalization Basin is then split into two basins, known as the North Aeration Basin and South Aeration Basin, each with a capacity of 2.4 million gallons. These two aeration basins also contain activated sludge. Each of the three basins contains mixers and oxygenators.

236.     DuPont states in its 2004 NOCS that its biological treatment system meets the PAI MACT definition of an "enhanced biological treatment system."

237.     40 C.F.R §§ 63.138(a) and 63.145(h)(i) require that performance tests be conducted on a biological treatment system except when the system is an *enhanced* biological treatment system.

238.     In order to be classified as an enhanced biological treatment system, the Equalization Basin system needs to be a thoroughly mixed unit without dead spots. As described by DuPont and observed by NEIC Inspectors, there were dead spots in the corners of the Equalization Basin where no mixing occurred. Therefore, the Equalization Basin could not be classified as a unit of an enhanced biological treatment system and performance testing was necessary to determine compliance with 40 C.F.R. § 63.138(a).

239.     DuPont failed to demonstrate compliance with the biological treatment process requirements of 40 C.F.R. § 63.138(a) and, therefore, was in violation of those requirements. DuPont also thereby violated 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 106.4(a)(6), 113.120, 113.700, and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

240.     DuPont failed to conduct performance testing on its biological treatment system, in violation of 40 C.F.R. §§ 63.145(h)(1) and 63.1362(d); 30 Tex. Admin. Code §§ 106.4(a)(6), 113.120, 113.700, and 122.143(4); and Texas Health and Safety Code Section 382.085(b).

241.     Subject to a reasonable opportunity for further investigation or discovery, these violations and the resulting potential emission of HAPs to the atmosphere likely continued at least until such time as either the performance test was completed, the biological treatment system was upgraded to an enhanced biological treatment system, or closure of the Lannate Process Area.

242.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

243.     Pursuant to Sections 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102, and 7.105, Defendant is also liable to the State for civil penalties for these violations.

### EIGHTEENTH CLAIM FOR RELIEF - CAA
(Failure to Comply with PAI MACT for Off-site Transfers and Incomplete NOCS)

244.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

245.     At the time of the Inspection, the condensed Lannate process wastewater liquid from the top of the TC Stripper was collected in a decanter. The organic layer of the decanter was shipped off-site for incineration. Because the organic layer of the decanter was the residual of the Group 1 wastewater stream, DuPont was required to comply with either the requirements of 40 C.F.R. § 63.132(g) or, as an alternative, with 40 C.F.R. § 63.1362(d)(14).

246.     In its NOCS, DuPont failed to provide the required information about its organic waste from the decanter as a residual from a Group 1 wastewater stream, in violation of 40 C.F.R. § 63.146(b)(6), and it failed to correct the incomplete information once it became aware of its inaccuracy, in violation of 40 C.F.R. § 63.1368(h). DuPont also thereby violated 40 C.F.R. § 63.1362(d); 30 Tex. Admin. Code §§ 113.120, 113.700, 116.115(c), and 122.143(4); and Texas

Health and Safety Code Section 382.085(b). Defendant's violations of NOCS requirements described above continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

247.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

248.    Pursuant to Sections 7.101 and 7.102 of the Texas Water Code, Tex. Water Code §§ 7.101 and 7.102, Defendant is also liable to the State for civil penalties for these violations.

## NINETEENTH CLAIM FOR RELIEF - CAA
### (Failure to Comply with PAI MACT Standards at Lannate Process - Lannate Incinerator and the Methylisocyanate (MIC) Incinerator - Inaccurate NOCS)

249.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

250.    At the time of the Inspection, DuPont manufactured the insecticide Lannate (methomyl), for which it had submitted a NOCS required under the PAI MACT regulations found at 40 C.F.R. Part 63, Subpart MMM. Uncontrolled HAP emissions from DuPont's Lannate process vents exceeded 0.15 Mg/yr.

251.    Pursuant to 40 C.F.R. § 63.1362(b)(2)(ii)(A), because the flow-weighted average flow rate for the process vents from DuPont's Lannate process as calculated in Equation 1 of 40 C.F.R. § 63.1362(b)(2)(ii)(A) was less than that of Equation 2, the emissions from the process unit were required to be reduced 98% or greater by weight unless otherwise provided in 40 C.F.R. § 63.1362 (b)(2)(ii)(B), which applies only to a control device installed on or before November 10, 1997 that achieves greater than 90% but less than 98% HAP emissions reduction.

252.    Process vent streams from operations of DuPont's Lannate process were controlled by one of two thermal vapor incinerators, known as the Lannate Incinerator and the Methylisocyanate (MIC) Incinerator.

51

253.     In a July 2003 stack test report by DuPont, both the Lannate and MIC Incinerators met a destruction efficiency of greater than 98%, which made the units subject to the 98% reduction requirement of 40 C.F.R. § 63.1362(b)(2)(ii)(A).

254.     At the time of the Inspection, the NOCS submitted by DuPont incorrectly identified its compliance option for organic HAP emissions as 40 C.F.R. § 63.1362(b)(2)(ii)(B), which allowed a minimum 90%-by-weight destruction efficiency for certain control devices.

255.     Because the Lannate and MIC Incinerators were capable of meeting the greater than 98% destruction efficiency standard of 40 C.F.R. § 63.1362(b)(2)(ii)(A), DuPont was not allowed to operate the Lannate and MIC Incinerators using the 90%-by-weight efficiency standard set forth in 40 C.F.R. § 63.1362(b)(2)(ii)(B).

256.     The NOCS requirements of 40 C.F.R. § 63.1368(a) and (f) incorporate by reference the NOCS requirements of 40 C.F.R. § 63.9(h)(2)(i). The NOCS submitted by DuPont was inaccurate and failed to attest that the source was in compliance with the relevant standard, in violation of NOCS requirements found at 40 C.F.R. § 63.1368(a) and (f) and 40 C.F.R. § 63.9(h)(2)(i), and DuPont failed to correct the NOCS once it became aware of its inaccuracy, in violation of 40 C.F.R. § 63.1368(h); 30 Tex. Admin. Code §§ 113.100, 113.700, 116.115(c) and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Defendant's violations of NOCS requirements described above continued until the 2004 NOCS was corrected or until closure of the Lannate Process Area.

257.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for civil penalties for each such violation.

258.     Pursuant to Sections 7.101 and 7.102 of the Texas Water Code, Tex. Water Code §§ 7.101 and 7.102, Defendant is also liable to the State for civil penalties for these violations.

## TWENTIETH CLAIM FOR RELIEF - CAA
### (Failure to Comply with PAI MACT at the HBU)

259.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

260.    At the time of the Inspection, DuPont manufactured an herbicide called Velpar in its HBU for which it had submitted a NOCS required under the PAI MACT regulations found at 40 C.F.R. Part 63, Subpart MMM.

261.    At the time of the Inspection, DuPont's NOCS stated that Group 1 wastewater streams from the Velpar process were routed to wastewater storage tanks in the Environmental Control Area designated to receive Group 1 wastewater streams. Therefore, the HBU storage tanks were subject to the requirements for Group 1 waste water streams in 40 C.F.R. § 63.133. These included inspection requirements at 40 C.F.R. § 63.133(f), and repair requirements at 40 C.F.R. § 63.133(h). The PAI MACT also requires that all wastewater tanks receiving a Group 1 wastewater stream comply with inspection requirements set forth in Table 11 of the PAI MACT.  40 C.F.R. § 63.143(a); 40 C.F.R. Part 63, Subpt. G, Table 11.

262.    DuPont failed to demonstrate compliance with the inspection and repair requirements of the PAI MACT because it failed to document the inspection and repair of a hole in an HBU tank observed by EPA during the inspection. The hole was subsequently repaired.

263.    DuPont's NOCS failed to set forth the methods for determining continued compliance with 40 C.F.R. § 63.143(a) at the Velpar process storage tanks, in violation of 40 C.F.R. § 63.9(h)(2)(C); 30 Tex. Admin. Code §§ 113.100, 116.115(c), and 122.143(4); and Tex. Health & Safety Code § 382.085(b).  Defendant's violations of NOCS requirements described above continued until the NOCS was corrected or until closure of the Lannate Process Area.

264.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable

for civil penalties.

265.     Pursuant to Sections 7.101, 7.102 and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.101, 7.102 and 7.105, Defendant is also liable to the State for civil penalties for these violations.

## TWENTY-FIRST CLAIM FOR RELIEF - CAA
### (Failure to Demonstrate Compliance with Polyether Polyols Production MACT at Biological Treatment Unit)

266.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

267.     LYCRA operates a packaging and industrial polymers unit that is co-located at the Facility. DuPont receives into its wastewater treatment system a Group 1 polyether polyol wastewater stream from LYCRA that is subject to the Polyether Polyols MACT requirements set forth in 40 C.F.R. Part 63, Subpart PPP.

268.     DuPont submitted a Polyether Polyols MACT NOCS to EPA in 2002.

269.     Section 63.1433(a) of the Polyether Polyol MACT requires that process wastewaters comply with requirements in 40 C.F.R. §§ 63.132 through 147.

270.     The Group 1 wastewater stream from LYCRA is hard piped into DuPont's biological treatment unit. DuPont asserts that its biological treatment unit is an enhanced biological treatment system and is, therefore, exempt from performance testing requirements in accordance with 40 C.F.R. § 63.145(h)(1). A biological treatment unit must be thoroughly mixed to qualify as an enhanced biological treatment system, as defined by 40 C.F.R. § 63.111. Because DuPont's biological treatment unit is not thoroughly mixed, it must comply with the performance testing requirements of 40 C.F.R. §§ 63.145(f) and (h) and 63.1433(a).

271.     DuPont's failure to conduct performance tests on its biological treatment system is a violation of 40 C.F.R. §§ 63.145(f), (h) and 63.1433(a); 30 Tex. Admin. Code §§

106.4(a)(6), 113.120, 113.730, and 122.143(4); and Texas Health and Safety Code Section 382.085(b). Subject to a reasonable opportunity for further investigation or discovery, this violation and the resulting potential emission of HAPs to the atmosphere has continued and will continue until such time as the performance test is completed or the biological treatment system has been upgraded to an enhanced biological treatment system.

272.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Defendant is liable to the United States for injunctive relief and civil penalties for each such violation.

273.     Pursuant to Sections 7.032, 7.101, 7.102, and 7.105 of the Texas Water Code, Tex. Water Code §§ 7.032, 7.101, 7.102, and 7.105, Defendant is also liable to the State for injunctive relief and civil penalties for these violations.

## TWENTY-SECOND CLAIM FOR RELIEF - CWA
### (Violations of Spill Prevention Control and Countermeasures Plan)

274.     Paragraphs 1 through 90 are realleged and incorporated herein by reference.

275.     During the Inspection, NEIC Inspectors found that Defendant had failed to fully implement its SPCC Plan for the Facility as follows:

A.     Defendant failed to implement the requirement for secondary containment of a diesel storage tank, as required by 40 C.F.R. § 112.8(c)(2), and Section I.D.2 of Defendant's SPCC Plan.

B.     Defendant failed to implement secondary containment for oil-containing transformers, as required by 40 C.F.R. § 112.7(c) and Section I.D.2 of Defendant's SPCC Plan.

C.     Defendant failed to ensure that the drainage valve on secondary containment was sealed, as required by 40 C.F.R. § 112.8(c)(3)(i).

276.    Defendant's failure to fully implement its SPCC Plan for the Facility is a violation of Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), as implemented by 40 C.F.R. § 112.3, that continues until Defendant fully implements its SPCC Plan.

277.    Defendant's SPCC Plan also failed to meet the requirements of 40 C.F.R. § 112.7, for the following reasons:

   A.    Defendant's SPCC Plan failed to provide an adequate description of the physical layout of the facility, as required at 40 C.F.R. § 112.7(a)(3)(ii)-(vi);

   B.    Defendant's SPCC Plan failed to describe information and procedures to enable a person reporting a discharge to comply with the requirements of 40 C.F.R. § 112.7(a)(4-5);

   C.    Defendant's SPCC Plan failed to set forth inspection, test, and recording procedures, as required by 40 C.F.R. § 112.7(e); and

   D.    Defendant's SPCC Plan failed to adequately describe training procedures, including failure to designate a person at the facility who is accountable for discharge prevention, as required by 40 C.F.R. § 112.7(f).

278.    Defendant's failure to prepare an adequate SPCC Plan is a violation of Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), as implemented by 40 C.F.R. § 112.3, that continues until Defendant prepares an adequate SPCC Plan.

279.    Pursuant to Section 311(b)(7)(C) of the CWA, 42, U.S.C. § 1321(b)(7)(C), Defendant is liable to the United States for civil penalties for each such violation of the CWA.

**TWENTY-THIRD CLAIM FOR RELIEF**
(Attorneys' Fees and Costs for State of Texas)

280.    Paragraphs 1 through 90 are realleged and incorporated herein by reference.

281.    This is an enforcement action brought by the State of Texas under the authority of

Subchapter D, Chapter 7, of the Texas Water Code; Tex. Water Code ch. 7, subch. D.

282. The State is entitled to recover reasonable attorneys' fees, court costs, and reasonable investigative costs incurred in relation to this proceeding, pursuant to Tex. Water Code § 7.108.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Texas, respectfully pray that this Court provide the following relief:

1. An order directing Defendant to take all steps necessary to comply with the statutory and regulatory requirements cited in this Complaint;

2. An order directing Defendant to take appropriate measures to mitigate the effects of its violations;

3. An order assessing civil penalties against Defendant in favor of the United States;

4. An order assessing civil penalties and attorneys' fees against the Defendant in favor of the State of Texas;

5. A judgment awarding the United States and the State of Texas the costs of this action; and

6.   All other appropriate relief.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA,

KAREN DWORKIN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

KENNETH G. LONG
Senior Attorney
DC Bar No. 414791
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:   202-514-2840
Facsimile:   202-616-6584
kenneth.long@usdoj.gov

ATTORNEY-IN-CHARGE

58

*United States and State of Texas v. E.I. du Pont de Nemours and Company*

RYAN K. PATRICK
United States Attorney
Southern District of Texas


By:     /s/ Andrew A. Bobb
        ANDREW A. BOBB
        Assistant United States Attorney
        SBOT No. 02530350 / Fed Bar # 9041
        1000 Louisiana, Suite #2300
        Houston, Texas 77002
        Telephone:     713 567-9766
        Facsimile:     713 718-3303

        ATTORNEYS FOR THE UNITED STATES

*United States and State of Texas v. E.I. du Pont de Nemours and Company*

FOR THE STATE OF TEXAS,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

Thomas H. Edwards
Assistant Attorney General
Tex. Bar No. 06461800
S.D. Tex. No. 152099
Thomas.Edwards@oag.texas.gov

ATTORNEY-IN-CHARGE

Jake K. Brown
Assistant Attorney General
Tex. Bar No. 24084234
S.D. Tex. No. 3470594
Jake.Brown@oag.texas.gov

Office of the Attorney General Environmental
Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

ATTORNEYS FOR THE STATE OF TEXAS
60